## UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| KEVIN KNISS, TED RABURN, and RANDY SWARTWOOD, <br><br> Plaintiffs, <br><br> v. <br><br> AMERICAN AIRLINES, INC., <br><br> Defendant. | ) ) ) ) ) ) ) ) ) ) ) ) ) Case No. 18-CV-212-JED-JFJ |

## **OPINION AND ORDER**

This matter comes before the Court on the motion to dismiss (Doc. 15) of Defendant American Airlines, Inc.

### I. PLAINTIFFS' ALLEGATIONS

The named plaintiffs in this putative class action work in Shop 205-1 of American's Tulsa aircraft-maintenance facility. Due to the nature of the work, employees in the shop work around potentially toxic substances, including paint dust and heavy metals such as lead and hexavalent chromium. The plaintiffs, who purport to represent a class of other Shop 205-1 employees, allege that American deliberately exposed workers in the shop to the dangerous substances. They further allege that the company violated federal anti-discrimination statutes when it forced employees to submit to blood tests in order to screen for health problems caused by their exposure to the substances.

In their complaint,[1] the plaintiffs claim that American has for decades "knowingly and intentionally exposed the Class Members to unusually high levels of toxic substances including lead, hexavalent chromium, paint dust and other harmful substances emanating in Defendant's

---

1. Plaintiffs' First Amended Complaint (Doc. 5) is the operative pleading for the purposes of this motion.

workshops." (Doc. 5 ¶ 36). From 1988 to 2014, they claim, two paint booths leaked overspray and paint dust from the sand booths into the plaintiffs' work area daily. Workers complained about the leaks, but American "failed to take adequate steps to stop the leaking even though [American] was aware that the materials leaked were harmful to its employees and extremely likely to cause long-term harm." (*Id.* ¶ 37). In the 1990s, a sanding booth was installed that recycled air through a filter and released it back into the shop, but "[s]and and paint dust fell out of the sound suppression hole of the reversers" contaminating areas where the putative class members worked and took breaks. (*Id.* ¶ 38). During the same period, paint booths were commingled with work areas used by the plaintiffs, even though American was allegedly aware that such booths should have been placed in a regulated area. In 2000, American attempted an overhaul, but that just made the filter problem worse due to the addition of more sound suppression holes. Again, the plaintiffs allege, American ignored complaints from workers.

The plaintiffs claim that the problems only proliferated from there. From 2007 to 2009, standards promulgated by the Occupational Safety and Health Administration required American to upgrade its filters and ventilation systems for the different booths. (*Id.* ¶ 40). The plaintiffs allege that American installed the new systems but then failed to maintain them, leading air to flow back into their work areas. (*Id.* ¶ 40). From 2009 to 2016, American finally removed the sand and paint booths to regulated areas, but the plaintiffs claim that their work areas continued to be contaminated with high levels of hexavalent chromium and other heavy metals. (*Id.* ¶ 42).

Although their job tasks included daily grinding, the plaintiffs say they were never warned about the risk posed by hexavalent chromium. Instead, the plaintiffs claim, American told them that continuous exposure to the metal was "okay because it was inert." (*Id.* ¶ 44). Moreover, the company "failed to provide training and failed to mandate wearing protective gear[,] despite

2

knowledge that Class Members were exposed to harmful substances daily." (Doc. 5 ¶ 45). Around 2014, American "made some employees who worked in shops around Class Members to the [sic] sign a confidential document stating that they knew they were exposed to dangerous substances." (*Id.* ¶ 47).

In January 2016, American sent an email to the Transport Workers Union indicating that employees subject to a "Medical Surveillance program" would be required to submit blood samples so they could be tested for heavy-metal exposure. (*Id.* ¶ 22). The union initially objected, but workers were told that OSHA regulations required employees of Shop 205-1 to undergo the testing because it was "an OSHA-regulated shop." (*Id.* ¶ 23). According to the plaintiffs, this was later discovered to be untrue. In January 2017, American's safety manager told OSHA that Shop 205-1 never tested "above action level" and was therefore not an OSHA-regulated shop. (*Id.* ¶ 30).

In May, when Plaintiff Kevin Kniss was due to give his blood sample, he questioned the legality of the testing. The next day, his supervisor gave him a letter saying that his refusal to provide a blood sample would be considered insubordination and would result in disciplinary action, possibly termination. Mr. Kniss nevertheless refused, after which "he was immediately taken out of service" by American, and he remained out of service for 24 hours. (*Id.* ¶ 26). Mr. Kniss's supervisor then asked him "if he was going to turn over his badge or submit to the blood test." (*Id.* ¶ 27). Mr. Kniss acquiesced and provided the blood sample.

When test results came back in September of 2016, "[s]ome Class Members were given false clean bills of health[,] while others were denied any results at all." (Doc. 5 ¶ 29). The plaintiffs allege that the purpose of the tests was "to further conceal the harm stemming from the exposure to hazardous substances." (*Id.* ¶ 86). Later, workers sought their own testing, which "confirm[ed] their adverse health results." (*Id.* ¶ 88). The independent testing "revealed that they all had

3

unusually high levels of the same heavy metals in their bloodstreams." (*Id.* ¶ 88). Members of the putative class have since seen their health deteriorate, and they continue to suffer symptoms of heavy-metal exposure, including weakness, joint pains, brain fogginess, and other neurological symptoms. They also "suffer the psychological fear of cancer." (*Id.* ¶ 89).

In connection with these allegations, the plaintiffs bring three claims. Claim One alleges that the mandatory blood tests violated the Genetic Information Nondiscrimination Act, which prohibits employers from gathering the genetic information of their employees. (*See* Doc. 5 ¶¶ 55–64). Claim Two alleges that the tests also violated the Americans with Disabilities Act, which prohibits employers from subjecting employees to involuntary medical examinations. (*See id.* ¶¶ 65–70). Finally, Claim Three alleges that American committed an "intentional tort" by exposing the plaintiffs to heavy metal and then concealing the results of their blood tests. (*See id.* ¶¶ 71–91).

## II. LEGAL STANDARD

American moves to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure. On a Rule 12(b)(6) motion, the Court's function is not to weigh the evidence that the parties might present at trial, but to assess whether the plaintiff's complaint is legally sufficient to state a claim upon which relief may be granted. *Brokers' Choice of Am., Inc. v. NBC Universal, Inc.*, 757 F.3d 1125, 1135 (10th Cir. 2014). A complaint is legally sufficient only if it contains factual allegations such that it states a claim to relief that "is plausible on its face." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Where the well-pleaded facts permit the court to infer merely the possibility of misconduct, the complaint has alleged, but it has not shown, that the pleader is entitled to relief. *Id.* at 679. In assessing a claim's plausibility, the Court must

4

accept all well-pleaded facts as true and view them in the light most favorable to the plaintiff. *Brokers' Choice*, 757 F.3d at 1136. The Court is not bound to accept an allegation as true when it amounts to no more than a legal conclusion masquerading as fact. *Iqbal*, 556 U.S. at 678.

## III.  DISCUSSION

American argues that the plaintiffs have not alleged the elements necessary to state a claim under GINA or the ADA. American further argues that, even if the plaintiffs had pleaded the required elements, only Mr. Kniss's statutory claims could proceed because he is the only plaintiff who exhausted his administrative remedies. Finally, American argues that the plaintiffs' tort claims must be dismissed because Oklahoma's workers' compensation scheme provides the exclusive remedy for their claims and because the claims are in any case time barred.

### A.  GINA Claims

The plaintiffs claim that American violated the Genetic Information Nondiscrimination Act when it required them to submit to the blood tests. The Act makes it unlawful for an employer to "request, require, or purchase genetic information with respect to an employee," unless the request falls within one of several enumerated exceptions. 42 U.S.C. § 2000ff-1(b). Included in the Act's definition of "genetic information" is "information about . . . [an] individual's genetic tests." *Id*. § 2000ff(4)(A). The Equal Employment Opportunity Commission, which enforces GINA, defines a "genetic test" as "an analysis of human DNA, RNA, chromosomes, proteins, or metabolites that detects genotypes, mutations, or chromosomal changes." 29 C.F.R. § 1635.3(f)(1); *see also* 42 U.S.C. § 2000ff(7). The regulations offer several examples of procedures that fall within the definition of "genetic test," such as amniocentesis and other evaluations used to determine the presence of genetic abnormalities in a fetus. 29 C.F.R. § 1635.3(f)(2)(iii). Other procedures are explicitly excluded from the definition of "genetic test." § 1635.3(f)(3)(i).

American contends that the plaintiffs "do not allege that American conducted genetic tests." (Doc. 15 at 11 [emphasis removed]). More precisely, the company argues that the alleged blood test, identified in the complaint as a "Chem20" panel, is not a "genetic test" within the meaning of the statute. The EEOC regulations exclude from the definition of "genetic test" any "analysis of proteins or metabolites that does not detect genotypes, mutations, or chromosomal changes." 29 C.F.R. § 1635.3(f)(3)(i). Since the complaint describes a Chem20 panel as "a comprehensive blood screen which [sic] tests for, among other things, protein and metabolite levels in the individual's blood," (Doc. 5 ¶ 60), American argues that a Chem20 panel is among those procedures that the regulations explicitly exclude from the definition of "genetic test." If a Chem20 panel is not a genetic test, the company argues, then the blood tests did not request genetic information and the plaintiffs cannot state a proper GINA claim.

The plaintiffs' argument in response is two-pronged. First, they contend that, "under the facts plead, it is clearly alleged that Defendant was not permitted to conduct the testing . . . *regardless of whether the testing obtained genetic information.*" (Doc. 18 at 10) (emphasis added). This is plainly untrue, as the statute's prohibition is limited to requests for "genetic information." 42 U.S.C. § 2000f-1(b). Thus, in order for a plaintiff to state a claim under GINA, it is not enough that the plaintiff allege that the employer requested some kind of medical information. The medical information must be *genetic* information as defined under the statute.

Second, the plaintiffs argue that a Chem20 is "a genetic test" (and therefore also "genetic information") because it can detect genetic mutations, albeit indirectly. Citing an article from a medical journal, which the plaintiffs attach to their response brief, the plaintiffs assert that "[l]owered protein levels are a determinative feature in assessing whether DNA is damaged by exposure to heavy metals." (Doc. 18 at 11; Doc. 18-2). Since protein levels are among the values

6

measured in a Chem20 panel, the plaintiffs argue that the panel *does* detect genetic mutations and is therefore a genetic test as defined by the EEOC. (*See* Doc. 18 at 11; Doc. 18-1).

In submitting evidence beyond the pleadings, the plaintiffs tacitly invite the Court to convert American's motion to dismiss into a motion for summary judgment. Normally, when a party has moved to dismiss under Rule 12(b)(6) for failure to state a claim upon which relief can be granted and matters outside of the pleadings have been presented to the court for consideration, the court must either exclude the material or treat the motion as one for summary judgment and dispose of it as provided by Rule 56. Fed. R. Civ. P. 12(d). In this case, the record is too poorly developed for a proper summary judgment analysis. The dispositive question is whether the Chem20 test, by detecting protein and metabolite levels, also detects genetic mutations or chromosomal changes. Without knowing more about exactly what a Chem20 measures and how this information may or may not indicate the presence of genetic mutations, the Court cannot determine whether there is a genuine dispute as to whether the Chem20 was a "genetic test." Consequently, rather than convert American's dismissal motion into a motion for summary judgment, the Court will exclude the material offered by the plaintiffs and limit its analysis to the facts as alleged in the complaint. Since the plaintiffs allege that the blood tests sought genetic information, they have stated a plausible GINA claim.

### B.   ADA Claims

The plaintiffs argue that the blood tests also violated the Americans with Disabilities Act (ADA). The primary provision of the ADA prohibits discrimination based on an individual's disability. 42 U.S.C. § 12112(a). The statute further provides that "the prohibition against discrimination . . . shall include medical examinations and inquiries." § 12112(d)(1). Claims under

7

this provision are often referred to generically as "§ 12112(d) claims" or "inquiry claims." Here, the plaintiffs sue under § 12112(d)(4)(A), which provides that

> [a] covered entity shall not require a medical examination and shall not make inquiries of an employee as to whether such employee is an individual with a disability or as to the nature or severity of the disability, unless such examination or inquiry is shown to be job-related and consistent with business necessity.

§ 12112(d)(4)(A). A plaintiff asserting a claim under § 12112(d)(4)(A) must show (1) that he is an employee of the defendant-employer, and (2) that the defendant-employer required him to undergo a medical examination or made a disability-related inquiry of him. *Williams v. FedEx Corp. Servs.*, 849 F.3d 889, 901 (10th Cir. 2017).

American argues that the plaintiffs fail to state a proper ADA claim because they have not alleged that the administration of the blood tests led to any compensable injury.[2] Multiple circuits have held that a plaintiff cannot recover for a § 12112(d) violation unless the plaintiff shows some harm beyond the statutory violation itself. *See Griffin v. Steeltek, Inc.*, 160 F.3d 591, 595 & n.5 (10th Cir. 1998) [*Griffin I*]; *Griffin v. Steeltek, Inc.*, 261 F.3d 1026 (10th Cir. 2001) [*Griffin II*]; *Armstrong v. Turner Indus., Inc.*, 141 F.3d 554, 562 (5th Cir.1998); *Harrison v. Benchmark Elecs.*

---

2. American also argues, almost as an afterthought, that the plaintiffs' ADA claims fail because they "do not allege that American obtained or was likely to obtain any information regarding a disability because of the testing." (Doc. 15 at 13). American, however, does almost nothing to develop this argument. The company cites no authority supporting the proposition that, when an employer conducts a medical examination on an employee, the employee must allege that the examination uncovered or would uncover information regarding a plaintiff's disability. Moreover, such a reading is at odds with the plain language of the statute. While the statute limits the prohibition on inquiries to inquiries into an employee's disabilities, the prohibition on medical examinations includes no such limitation. *See* 42 U.S.C. § 12112(d)(4)(A) ("A covered entity shall not require a medical examination and shall not make inquiries of an employee as to whether such employee is an individual with a disability or as to the nature or severity of the disability, unless such examination or inquiry is shown to be job-related and consistent with business necessity."). Accordingly, to the extent this argument is not waived due to the cursory manner in which it was raised, the Court rejects it.

*Huntsville, Inc.*, 593 F.3d 1206, 1217 (11th Cir. 2010); *Tice v. Ctr. Area Transp. Auth.*, 247 F.3d 506, 520 (3d Cir. 2001); *Cossette v. Minnesota Power & Light*, 188 F.3d 964, 970, 971 (8th Cir. 1999).[3]

Here, the complaint includes no allegations that the plaintiffs suffered any injury beyond the imposition of the blood test itself. The Court is not convinced by the plaintiffs' argument that Mr. Kniss's being "taken out of service" for 24 hours supplies the necessary injury. (Doc. 18 at 13). The plaintiffs do not allege that Mr. Kniss suffered any demotion or loss of pay. Nor do they allege that Mr. Kniss suffered any emotional harm due to the suspension. A brief interruption in work duties, without more, is not sufficient to establish harm beyond the statutory violation.[4] Moreover, even if it were, the complaint includes no allegation that American ever took the other named plaintiffs out of service or otherwise disciplined them for refusing to submit to the blood test. Accordingly, their claims necessarily fail as well.

C.     **Exhaustion**

American further argues that, even if the complaint adequately pleaded GINA and ADA violations, the claims of the putative class members, including named plaintiffs Mr. Raburn and

---

3. In *Griffin I*, the Tenth Circuit described the necessary showing as requiring the plaintiff to allege an "injury in fact," language suggesting that the issue is a question of standing. *Griffin I*, 160 F.3d at 595. Some courts, however, have discussed the issue in terms of "damages" and cast the requirement as part of the plaintiff's prima facie case. *See, e.g.*, *Harrison*, 593 F.3d at 1217 n.12. Whether the injury/damages requirement is viewed as an element of standing or of the prima facie case, the courts agree that some harm beyond the statutory violation itself is required.

4. Unlike in a traditional discrimination case, a plaintiff alleging an improper medical exam or inquiry need not allege that it was his disability or perceived disability that led to the injury. *See Griffin I*, 160 F.3d at 595 & n.5. In *Griffin I*, the court permitted the plaintiff to advance on a theory that a prospective employer refused to hire him because of his responses to the impermissible inquiries, not because he was disabled or because the company thought he was disabled. Nevertheless, a plaintiff must "'prove injury flowing from' the statutory violation." *Garrison v. Baker Hughes Oilfield Operations, Inc.*, 287 F.3d 955, 963 (10th Cir. 2002) (quoting *Griffin I*, 160 F.3d at 595 & n.5). Moreover, the alleged injury must be "tangible." *Id.*

Mr. Swartwood, must fail because only Kniss exhausted his administrative remedies. Both the ADA and GINA have adopted the procedural scheme set up under Title VII of the Civil Rights Act of 1964. *See* 42 U.S.C. § 12117(a); 42 U.S.C. § 2000ff-6. Under this scheme, before a plaintiff can file a civil action for discrimination, she must timely exhaust her administrative remedies by filing a charge of discrimination with the EEOC. 42 U.S.C. § 2000e-5(e)(1), (f)(1). When the plaintiff does sue, the exhaustion requirement limits the scope of her claims to the "unlawful employment practices" described in her administrative charge. *Montes v. Vail Clinic, Inc.*, 497 F.3d 1160, 1166 (10th Cir. 2007). Failure to properly exhaust the claim operates as an affirmative defense rather than a jurisdictional bar. *Lincoln v. BNSF Ry. Co.*, 900 F.3d 1166, 1185 (10th Cir. 2018).

Although Mr. Kniss did file an EEOC charge, American argues that it cannot satisfy the exhaustion requirement for his fellow named plaintiffs or members of the putative class. Quoting the Tenth Circuit's opinion in *Gulley v. Orr*, the company asserts that "[e]xhaustion of individual administrative remedies is insufficient to commence a class action in federal court; rather, one of the named plaintiffs must have exhausted class administrative remedies." (Doc. 15 at 19, quoting *Gulley v. Orr*, 905 F.2d 1383, 1385 (10th Cir. 1990)). American contends that Mr. Kniss's charge, which American attaches to its motion, (*see* Doc. 15-1), did not exhaust class administrative remedies because the charge did not include an explicit class action allegation and instead "focus[ed] on Kniss's individual experience." (Doc. 15 at 19–20). In particular, American highlights the fact that the charge mentions Kniss's interaction with *his* supervisor and *his* job duties and lists the day *he* submitted his blood sample as the date of the alleged discriminatory conduct.

American's reliance on *Gulley* is misplaced. In *Gulley*, the plaintiffs were federal employees whose employment claims were subject to a detailed regulatory scheme that included specific procedures for class claims. And it was this "distinct administrative mechanism[,] created specifically to address class claims of discrimination," that led to the court's holding. *See Gulley*, F.2d at 1384–85. Here, by contrast, the plaintiffs are private-sector employees whose claims are governed by the EEOC's generally applicable procedural rules. Thus, *Gulley* has nothing to say about whether and when an individual plaintiff may exhaust claims against a private employer on behalf of a class of similarly situated colleagues. *See, Equal Emp. Opportunity Comm'n v. Horizontal Well Drillers, LLC*, No. CIV-17-879-R, 2018 WL 3029108 (W.D. Okla. June 18, 2018).

In the private-employment context, courts have "universally recognized an exception to the individual filing rule." *Foster v. Ruhrpumpen, Inc.*, 365 F.3d 1191, 1197 (10th Cir. 2004); *see also Thiessen v. Gen. Elec. Capital Corp.*, 267 F.3d 1095, 1109–10 (10th Cir. 2001). The "single filing rule" generally allows a plaintiff who did not file an EEOC charge "to piggyback on the EEOC complaint filed by another person who is similarly situated." *Thiessen*, 267 F.3d at 1110 (quoting *Mooney v. Aramco Servs. Co.*, 54 F.3d 1207, 1223 (5th Cir.1995). The Tenth Circuit explained the reason for the exception this way:

> "The principle behind the piggybacking rule is to give effect to the remedial purposes of the ADEA and to not exclude otherwise suitable plaintiffs from an ADEA class action simply because they have not performed the useless act of filing a charge." *Grayson v. K–Mart Corp.,* 79 F.3d 1086, 1103 (11th Cir.1996) (internal quotation marks omitted). The act of filing a charge is deemed "useless" in situations in which the employer is already on notice that plaintiffs may file discrimination claims, thus negating the need for additional filings. *See Horton v. Jackson County Bd. of County Comm'rs,* 343 F.3d 897, 899 (7th Cir.2003); *see also Thiessen v. Gen. Elec. Capital Corp.,* 267 F.3d 1095, 1110 (10th Cir.2001) ("The policy behind the single filing rule is that it would be wasteful, if not vain, for numerous employees, all with the same grievance, to have to process many identical complaints with the EEOC.") (internal quotation marks and alteration

omitted); *Tolliver v. Xerox Corp.*, 918 F.2d 1052, 1057 (2d Cir.1990) ("The purpose of the administrative charge requirement is to afford the agency the opportunity to 'seek to eliminate any alleged unlawful practice by informal methods of conciliation, conference, and persuasion.' If the agency charged with that task is satisfied that a timely filed administrative charge affords it sufficient opportunity to discharge these responsibilities with respect to similar grievances, it serves no administrative purpose to require the filing of repetitive ADEA charges . . . .") (quoting 29 U.S.C. § 626(d)).

*Foster*, 365 F.3d at 1197.

Thus, the question is not whether it is permissible for a plaintiff to piggyback on another's EEOC charge, it is whether these particular plaintiffs can piggyback on the charge filed by Mr. Kniss. Courts have applied different rules for determining when the single-filing rule should apply:

> The broadest test requires only that the claims of the administrative claimant and the subsequent plaintiff arise out of the same circumstances and occur within the same general time frame. . . . A somewhat narrower test requires that the administrative claim give notice that the discrimination is "class-wide," i.e., that it alleges discrimination against a class of which the subsequent plaintiff is a member. A still narrower test requires that the administrative charge not only allege discrimination against a class but also allege that the claimant purports to represent the class or others similarly situated.

*Id.* at 1197–98 (quoting *Howlett v. Holiday Inns, Inc.*, 49 F.3d 189, 195 (6th Cir. 1995). In *Thiessen*, the case in which the Tenth Circuit recognized the single-filing rule, the court mentioned a broad test that would allow a plaintiff who did not file to piggyback on the filing of a "similarly situated" plaintiff, and a somewhat narrower test allowing piggybacking if the filed EEOC charge "gave the employer notice of the collective or class-wide nature of the charge." *Thiessen*, 267 F.3d at 1110.

In *Foster*, the court recognized the ambiguity of *Thiessen*'s holding but declined to settle on a standard. *Foster* involved a group of 26 former colleagues who sued for age discrimination after a manufacturing company acquired their former employer and declined to hire them during the transition. Most of the workers had filed EEOC charges, each of which stated that "this charge

12

is made on behalf of all others similarly situated." *Foster*, 365 F.3d at 1193. Faced with the question of whether the non-filing plaintiffs could sue, the court held that the single-filing rule should apply. In doing so, the court reasoned that *Thiessen's* broad test was met because the plaintiffs' unexhausted claims stemmed from the same conduct that had been alleged in the filed EEOC charges, so the plaintiffs were clearly "similarly situated." *Id.* at 1199. Moreover, because the filing plaintiffs stated in their EEOC charges that they were bringing their complaint "on behalf of all others similarly situated," the charges "gave notice of the collective or class-wide nature of the charge." *Id.* Thus, the somewhat narrower test was also satisfied.

The circumstances in this case also satisfy both of *Thiessen*'s single-filing tests. Like the plaintiffs in *Foster*, Mr. Swartwood's and Mr. Raburn's claims stem from precisely the same conduct alleged in Mr. Kniss's EEOC charge, so the plaintiffs are undoubtedly "similarly situated." Moreover, although Mr. Kniss did not explicitly bring his EEOC charge on behalf of a class, his allegations were not, as American would argue, so focused on his own experience that it was unclear whether the alleged misconduct extended to other employees. In his charge, Mr. Kniss claimed that American forced him to undergo an unnecessary blood test and threatened to fire him if he refused. (Doc. 15-1). He then alleged that "[b]etween 90 – 100 other employees were also forced to give blood or threatened with termination." (*Id.*). Thus, although Mr. Kniss did not explicitly purport to represent a class in his EEOC charge, he did allege that he was a member of a class of employees that had been subjected to the same prohibited conduct. This was sufficient to put American on notice of the "class-wide nature of the charge." Because all the plaintiffs are "similarly situated" and the filed EEOC charge gave American the requisite notice, the single-filing rule applies. Mr. Swartwood and Mr. Raburn may piggyback on Mr. Kniss's filed EEOC charge.

13

### D. Intentional Tort Claims

Finally, American argues that the plaintiffs' tort claims are barred by the exclusive-remedy provisions in Oklahoma's Administrative Workers' Compensation Act. The relevant provisions of the Act provide as follows:

> A. The rights and remedies granted to an employee subject to the provisions of the Administrative Workers' Compensation Act shall be exclusive of all other rights and remedies of the employee . . . .
>
> B. Exclusive remedy shall not apply if:
> . . . .
> > 2. The injury was caused by an intentional tort committed by the employer. An intentional tort shall exist only when the employee is injured as a result of willful, deliberate, specific intent of the employer to cause such injury. Allegations or proof that the employer had knowledge that the injury was substantially certain to result from the employer's conduct shall not constitute an intentional tort. The employee shall plead facts that show it is at least as likely as it is not that the employer acted with the purpose of injuring the employee. The issue of whether an act is an intentional tort shall be a question of law.

Okla. Stat. tit. 85A, § 5.

In their response brief, the plaintiffs argue extensively that their claims are not subject to the exclusive-remedy provisions because American knew that its conduct was "substantially certain" to injure the plaintiffs. (*See* Doc. 18 at 14–29). In doing so, however, they rely on authority that the present statute has superseded.

Prior to the passage of the current statute, the Oklahoma Supreme Court had held that the exclusive-remedy provision did not apply to willful conduct. *See Parrett v. UNICCO Serv. Co.*, 127 P.3d 572, 579 (Okla. 2005) (holding that plaintiffs could sue in tort when the employer "(1) desired to bring about the worker's injury or (2) acted with the knowledge that such injury was substantially certain to result from the employer's conduct."). In 2013, however, the state legislature adopted a statute limiting workplace torts committed with specific intent. *See* 2013

Okla. Sess. Laws § 208 (S.B. 1062). Under the current statute, the employee must "plead facts that show it is at least as likely as it is not that the employer acted with the purpose of injuring" him. Okla. Stat. tit. 85A, § 5B.2. Thus, the statute extended the exclusive remedy provision to those cases involving willful misconduct (i.e., cases where the employer knew with substantial certainty that its actions would result in injury).

Here, the plaintiffs' allegations support only an inference that American acted with the knowledge that its conduct was substantially certain to injure the plaintiffs. Since this is not enough under the current standard, the exclusive-remedy provision applies and their tort claims must be dismissed.

### III. CONCLUSION

For the reasons stated above, Defendant's motion to dismiss (Doc. 15) is **granted** with respect to Plaintiffs' ADA and intentional tort claims and **denied** with respect to their GINA claims. The Court grants the plaintiffs leave to amend their complaint in order to address the deficiencies described in this opinion, provided the amended complaint is filed within 14 days of the entry of this order.

SO ORDERED this 19th day of November, 2020.

JOHN E. DOWDELL, CHIEF JUDGE
UNITED STATES DISTRICT COURT